# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

VLADIMIR FISHEL,
KAPITALFORENINGEN
SAMPENSION INVEST,
GLOBALT AKTIEINDEKS and
KAPITALFORENINGEN
SAMPENSION INVEST,
GLOBALT AKTIEINDEKS
ENHANCED,

       Plaintiffs,

       v.

LIBERTY MEDIA CORPORATION,
JOHN C. MALONE, GREGORY B.
MAFFEI, EDDY W.
HARTENSTEIN, JAMES P.
HOLDEN, DAVID A. BLAU, ROBIN
P. HICKENLOOPER, JENNIFER
WITZ, EVAN MALONE, JAMES
MEYER, JONELLE PROCOPE,
MICHAEL RAPINO, KRISTINA
SALEN, CARL E. VOGEL, and
DAVID ZASLAV,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2024-1057-KSJM

## MEMORANDUM OPINION

Date Submitted: June 27, 2025
Date Decided: April 13, 2026

Daniel E. Meyer, Benjamin M. Potts, Margaret Rockey, JOHNSON VAN KWAWEGEN LLP, Wilmington, DE; Jeroen van Kwawegen, Thomas G. James, JOHNSON VAN KWAWEGEN LLP, New York, NY; Lee D. Rudy, J. Daniel Albert, Lauren C. Lummus, Nakib A. Kabir, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, PA; *Counsel for Plaintiffs Vladimir Fishel, Kapitalforeningen Sampension Invest, Globalt Aktieindeks and Kapitalforeningen Sampension Invest, Globalt Aktieindeks Enhanced.*

A. Thompson Bayliss, April M. Ferraro, S. Michael Blochberger, ABRAMS & BAYLISS LLP, Wilmington, DE; Maeve L. O'Connor, Amy C. Zimmerman,

DEBEVOISE & PLIMPTON LLP, New York, NY; *Counsel for Defendants Eddy W. Hartenstein and James P. Holden.*

Raymond J. DiCamillo, Matthew W. Murphy, Daniel E. Kaprow, RICHARDS LAYTON & FINGER, P.A., Wilmington, DE; Jonathan K. Youngwood, Janet A. Gochman, Jonathan S. Kaplan, SIMPSON THACHER & BARTLETT LLP, New York, NY; *Counsel for Defendants James Meyer, Jennifer Witz, Michael Rapino, David Zaslav, Jonelle Procope, Kristina Salen, and Carl E. Vogel.*

Kevin R. Shannon, Jaclyn C. Levy, Lilianna Anh P. Townsend, POTTER ANDERSON CORROON LLP, Wilmington, DE; Richard B. Harper, Kristina Wenner, BAKER BOTTS LLP, New York, NY; Thomas E. O'Brien, Olivia J. Countryman, BAKER BOTTS LLP, Dallas, TX; *Counsel for Defendants Liberty Media Corporation, John C. Malone, Gregory B. Maffei, David A. Blau, Robin P. Hickenlooper, and Evan Malone.*

**McCORMICK, C.**

The stockholder plaintiffs challenge the September 2024 spin-off of SiriusXM Holdings Inc. ("Old Sirius") by its controller, Liberty Media Corporation ("Liberty"). The spin-off and related transactions resulted in the creation of Liberty SiriusXM Holdings Inc. ("New Sirius," with Old Sirius, the "Company")—an independent company with no controlling stockholder. The transactions also eliminated Liberty's tracking stock tied to its Old Sirius holdings. The tracking stock traded at a discount to the net asset value of those holdings (the "NAV Discount"). Eliminating the tracking stock eliminated the NAV Discount, a unique, multi-billion dollar benefit that Liberty alone enjoyed. To manage this conflict, the Company's board of directors (the "Board") formed a two-person special committee to negotiate the transactions. The plaintiffs allege that the special committee members made no effort to negotiate a benefit for the minority stockholders for agreeing to transactions that collapsed the NAV Discount. They also allege that each of the director defendants lacked independence from Liberty or were interested in the transactions.

Defendant John Malone controls Liberty. John's son, Defendant Evan Malone, serves on the Company's Board of Directors. Defendant Gregory B. Maffei has served as director, President, and CEO of Liberty Media since May 2007. And two Company executives served on the Board that approved the challenged transactions—David Blau and Robin Hickenlooper. Liberty, the Malones, Maffei, Blau, and Hickenlooper (together, the "Liberty Defendants") answered the complaint. The claims against them have been moving forward.

Meanwhile, the other defendants moved to dismiss the complaint. The movants fall into two categories: the special committee members (the "Committee Defendants") and all others (the "Non-Committee Defendants"). Both groups argue that the plaintiffs failed to plead non-exculpated claims against them required under *In re Cornerstone Stockholders Litigation*.[1] In response to the motion, the plaintiffs argue each group of movants acted disloyally.

As to the Non-Committee Defendants, the plaintiffs argue that each lacked independence from the Liberty Defendants and voted for the challenged transactions. The Non-Committee Defendants concede these points. But they contend Plaintiffs still fail to plead a non-exculpated claim against them. *Cornerstone* requires that the conflicted director act to advance the interest of an interested party. The only allegation of them advancing others' interests is their vote for the challenged transactions. The Non-Committee Defendants argue that voting in favor of the challenged transactions is not enough. They also argue that aspects of the plaintiffs' claims are derivative and thus, under *Lewis v. Anderson*,[2] the merger extinguished their standing. This decision rejects the Non-Committee Defendants' arguments and denies their motion to dismiss.

As to the Committee Defendants, the plaintiffs advance a controlled-mindset theory, claiming that the committee members bent to the will of the controller without explanation. But the plaintiffs do not plead the extreme set of process flaws

[1] 115 A.3d 1173 (Del. 2015).

[2] 477 A.2d 1040 (Del. 1984).

2

from which this court can infer that otherwise disinterested and independent directors acted with a controlled mindset. This decision thus grants the Committee Defendants' motion to dismiss.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Class Action Complaint (the "Complaint") and the documents it incorporates by reference.[3]

### A. Liberty Invests In Old Sirius.

The Company, a Delaware corporation, is a leading audio entertainment company in the United States. It operates two complementary audio entertainment businesses—SiriusXM and Pandora. SiriusXM features a variety of audio channels, podcasts, and entertainment services on a subscription-fee basis. Pandora is a music, comedy, and podcast streaming platform.

John Malone[4] co-founded Liberty, controls 48.8% of Liberty's voting power, and chairs Liberty's board of directors. Liberty first invested in the Company in February 2009, providing $530 million in loans in exchange for 40% of its outstanding shares. Liberty bought more Old Sirius shares in the open market in August 2012. Liberty then converted its preferred shares to common stock, bringing its voting power to about 50%. By early 2013, Liberty owned a majority of Old Sirius's outstanding common stock.

---

[3] C.A. No. 2024-1057-KSJM, Docket ("Dkt.") 1 ("Compl.").

[4] To distinguish Evan Malone from his father, who played more of a role in the relevant events, this decision refers to Evan Malone by his full name and John Malone by his last name only.

3

Before the challenged transactions, Liberty had three classes of common stock that reflected (or "tracked") the economic performance of three groups of assets: Old Sirius; Formula One Group ("Formula One"); and Live Nation Entertainment, Inc. ("Live Nation"). Liberty referred to its ownership in Old Sirius, including Liberty Media's shares of Old Sirius and related liabilities, as the Liberty SiriusXM Group ("LSXM Group"). The LSXM Group had three publicly traded series of stock: single-vote Series A (LSXMA); ten-votes-per-share Series B (LSXMB); and no-vote Series C (LSXMK) (collectively, "LSXM").

LSXM shares historically traded at a discount to the net asset value of the underlying assets those LSXM shares "tracked." That gap in value is the NAV Discount. At times, the NAV Discount reached 40%. Liberty Media attributed the discount to the degree of capital support for Old Sirius and LSXM shares, the lack of liquidity of LSXM stock, and the complexity of the tracking structure, among other factors.

In January 2014, Liberty publicly offered to purchase the outstanding Old Sirius shares. The Board formed a special committee in response. It comprised Hartenstein, Holden, and Joan Amble (a former SiriusXM director). The deal failed.

But Liberty retained incentives to increase its ownership in Old Sirius. Two ownership thresholds held significance. The first was the 80% threshold, which had two consequences: Liberty would receive Old Sirius dividends tax-free, thus potentially reducing the NAV Discount. And Old Sirius would qualify as an active

4

trade or business, thus opening transactional opportunities for Liberty. The second was the 90% threshold, after which Liberty could execute a short-form merger.

**B.    Liberty's Relative Ownership Of Old Sirius Increases As A Result Of Old Sirius's Repurchase Program.**

Meanwhile, in 2013, Old Sirius instituted a stock repurchase program (the "Repurchase Program"). The Old Sirius Board allocated capital to the Repurchase Program through 2021, but Liberty did not sell shares in the program after 2014. Each repurchase after 2014 thus had the effect of increasing Liberty's relative ownership of Old Sirius.

According to the Complaint, the Repurchase Program was designed to increase Liberty's relative ownership and elevate Liberty closer to the 80% and 90% thresholds.

**C.    Old Sirius Forms A Special Committee To Negotiate A Tax Sharing Agreement.**

The Complaint states that Liberty's Chief Legal Officer, Renee Wilm, and Old Sirius' General Counsel, Patrick Donnelly, communicated frequently by phone and Telegram, an encrypted messaging application. Each kept the other informed of whether Liberty might reach the 80% threshold.

By the second half of 2020, Liberty owned about 74% of the Company's voting stock. On October 5, 2020, Old Sirius' senior management and financial advisor, Barclays, reviewed Liberty's options. Barclays advised the Board that Old Sirius could negotiate a tax sharing agreement with Liberty to ensure that Old Sirius minority stockholders were treated fairly as Liberty approached the 80% and 90% thresholds.

The Board considered Barclays' proposed tax-sharing agreement during a meeting on October 6, 2020.  The thirteen-person Board comprised:

- Liberty President and CEO Maffei;

- Old Sirius' CEO (from December 2012 to December 2020) James Meyer;

- Old Sirius' CEO (from January 2021 onward) Jennifer Witz;

- Liberty Executive Vice President of Corporate Development Blau;

- Liberty Senior Vice President of Corporate Development Hickenlooper;

- Evan Malone; and

- Outside directors Eddy Hartenstein, James Holden, Michael Rapino, David Zaslav, Jonelle Procope, Kristina Salen, and Carl Vogel.

During the October 6 meeting, the Board formed a special committee comprising Hartenstein and Holden (the "Special Committee" or the "Committee Defendants").  Although Amble too was a member of the special committee formed in 2014, Maffei excluded her from this second committee.  He described her as "difficult," and unfit for service on the Special Committee.[5]  Maffei sent Hartenstein to deliver the message.

The Board empowered the Special Committee to "review, evaluate, discuss, consider, negotiate, authorize, and approve a potential tax sharing agreement between Liberty and [SiriusXM] and any other arrangements the Special Committee determines are advisable and in the best interest of [SiriusXM] and its stockholders in connection therewith . . . or any alternative arrangement thereto[.]"[6]

---

[5] *Id.* ¶ 50.

[6] *Id.*

6

**D.      Liberty And Old Sirius Enter The Tax Sharing Agreement.**

The Special Committee and Liberty began negotiations over a tax sharing agreement in November 2020. The Special Committee approved an agreement (the "Tax Sharing Agreement") by written consent on January 27, 2021. The Tax Sharing Agreement required Old Sirius to pay Liberty for losses generated by members of Liberty's consolidated tax group other than Old Sirius. It also precluded Old Sirius from filing as a stand-alone entity and benefitting from tax credits.

Old Sirius' stock traded down after announcement of the Tax Sharing Agreement on February 1, 2021, but Liberty's tracking stocks traded up. Maffei observed to Malone on February 2 that the "LSXM spread tightened today with our tax sharing agreement."[7]

**E.      Liberty And Old Sirius Execute The 253 Agreement And Old Sirius Increases Quarterly Dividends.**

Throughout 2021, Liberty planned a transaction involving Old Sirius to compress the NAV Discount.[8] That plan would involve Liberty: accreting to near 80% ownership through the Repurchase Program; executing a tax-free exchange of LSXM shares for Old Sirius shares to surpass the 80% threshold and preserve the ability to argue that Old Sirius was an "active trade or business";[9] acquiring the Old Sirius

---

[7]  *Id.* ¶ 55.

[8] *Id.* ¶ 62.

[9] An active trade or business or "ATB" is a designation for controlled subsidiary entities under Section 355 of the Internal Revenue Code. *See* 26 U.S.C. § 355. If a controlled subsidiary is considered an active trade or business of its parent entity, the parent's stockholders can receive distributions of the subsidiary's stock without incurring tax liability. Gregory N. Kidder, *Basics of U.S. tax-free spin-offs under section 355*, 5 International Taxation 438, 438–39 (Nov. 2011).

minority shares; and cleaning up LSXM by removing or spinning off other business units.[10]

According to the Complaint, Old Sirius fiduciaries—including Old Sirius' then-CEO Witz—facilitated this plan in two ways. First, they increased the Repurchase Program to enable Liberty to accrete to near-80% ownership. Second, after Liberty reached 80%, they changed "SiriusXM's capital allocation policy to accommodate" Liberty's desire for additional liquidity and further shrink the NAV Discount.[11]

Given Liberty's evolving goals, the Board expanded the Special Committee's mandate in mid-October 2021. As revised, the mandate included proposing, negotiating, and evaluating any transaction or arrangement between Liberty and Old Sirius.[12] Liberty previewed and commented on the resolutions authorizing the Special Committee's expanded mandate.[13] The Special Committee retained Solomon Partners LLC ("Solomon") as its financial advisor. Liberty assisted in negotiating Solomon's fee.

On October 13, 2021, Liberty asked Old Sirius to agree to allow Liberty to surpass 80% and receive tax-free SiriusXM dividends (the "Tax Letter"). Five days later, the Special Committee met to discuss the proposal. Neither the Special Committee nor the Board asked Liberty to provide financial consideration in exchange for the proposed tax benefits. Solomon did not seek to secure increased

---

[10] Compl. ¶ 62.

[11] *Id*. ¶¶ 56, 60.

[12] *Id*. ¶ 72.

[13] *Id*. ¶ 69.

consideration for minority stockholders with respect to the merger. Nor did the Special Committee address any other ways that Liberty was considering closing the NAV Discount. In exchange for allowing Liberty to cross the 80% threshold, however, Liberty agreed not to effectuate a short-form merger under Section 253 of the Delaware General Corporation Law without the Special Committee's consent (the "253 Agreement").

On October 22, 2021, the Special Committee recommended that the Board increase SiriusXM's quarterly dividend. The general counsels of Old Sirius and Liberty then worked together to plan the October 25, 2021 Board meeting where the Board approved the 50% increase of its quarterly dividend that Old Sirius management proposed with Liberty's input.[14] On October 25, the Board approved the 50% increase of the quarterly dividend under the guidance of Old Sirius General Counsel Donnelly and Liberty's Chief Legal Officer Wilm.

On January 3, 2022, Liberty Media learned that SiriusXM was considering a $1 billion special dividend. On January 31, after soliciting Liberty's input, the Board approved the special dividend.

### F. Liberty Exceeds The 80% Threshold.

Liberty used the increased dividend approved in October 2021 to attain a tax-free exchange of LSXM shares for SiriusXM through a third party, Berkshire Hathaway. On November 1, 2021, Liberty entered into an exchange agreement with Berkshire Hathaway where Liberty acquired approximately 43,700,000 SiriusXM

---

[14] *Id*. ¶ 74.

shares in exchange for about 5,350,000 LSXM shares. Liberty exceeded the 80% threshold due to the transaction.

### G.    Liberty Media Proposes A Combination With SiriusXM.

After Liberty crossed the 80% threshold, it began to take steps toward a short-form merger. It spun off Live Nation and Braves Group into their own tracking stock and cleaned up Formula One's tracking stock structure.

On September 10, 2023, Liberty's financial advisor, J.P. Morgan, discussed the Company's ownership structure with Solomon. On September 14, Liberty's legal counsel asked the Special Committee if it would make a proposal to rationalize the Company's ownership structure. The Special Committee met on September 18, 2023 and determined that it would not propose a structure but would consider a proposal from Liberty.

On September 22, 2023, Liberty proposed to combine with SiriusXM through a series of three transactions (the "Transactions"). First, Liberty Media would form a new entity, New Sirius, that would acquire the assets and liabilities attributed to LSXM Group. Second, Liberty Media would redeem the LSXM shares at a 1:1.05 exchange ratio. Third, New Sirius would merge with Old Sirius. Old Sirius stockholders would receive New Sirius shares at a 1:1 exchange ratio, plus 55 cents for each Old Sirius share.

Liberty also proposed that existing LSXM stock options issued to John Malone, Maffei, and other Liberty directors and officers would roll into equivalent New Sirius options. Further, New Sirius would assume all liabilities and any litigation related

10

to the transaction. New Sirius would also be responsible for all taxes allocated to Liberty under Liberty's tax-sharing policies.

On September 25, 2023, the NAV Discount decreased from 46 percent to 32 percent. On September 26, Liberty publicly announced that it had communicated the proposal to the Special Committee.

On September 28, 2023, Solomon and the Special Committee entered into a new agreement whereby Solomon would receive a $6 million retainer, a $2 million fee for a fairness opinion, and a $22 million success fee upon closing of the Transactions.

### H. The Special Committee And Liberty Negotiate The Transactions.

On October 5, 2023, the Special Committee met with its advisors and discussed counterproposals. These potential counterproposals included reducing the number of New Sirius shares that LSXM stockholders would receive in lieu of cash. Solomon communicated that an all-stock transaction would lower the exchange ratio from 1:05:1 to 1:1 but said nothing about how collapsing the NAV Discount resulted in added value for LSXM stockholders. Old Sirius agreed to assume certain liabilities. Solomon identified that New Sirius would be liable for the tax contingencies allocated to LSXM Group under a 2021 tax-sharing agreement and if the 2023 tracking stock reclassifications failed to receive tax-free treatment.

The Special Committee also discussed conditioning any transaction on a majority vote of Old Sirius' minority stockholders. It decided not to pursue the vote requirement, reasoning that it would make the Transactions vulnerable to activist investors.

11

The Special Committee counter proposed a 1:1 exchange ratio. New Sirius minority stockholders would receive cash, assume liability in connection with any debt, equity, awards, and taxes, but not bear the cost of any litigation liabilities related to the Transactions.

On October 9, 2023, representatives from Old Sirius, Liberty, and their advisors met to discuss the details around the debt that New Sirius would assume. They came up with a new tax-sharing agreement.

On October 10, 2023, Liberty insisted on a 1:1.01 exchange ratio to achieve a premium from the NAV Discount.

Liberty considered compensating the Old Sirius minority stockholders for assuming New Sirius's liabilities through an adjustment of the exchange ratio rather than cash. The adjustment would be based on valuing LSXM Group's net liabilities at a reference price and increasing Old Sirius minority stockholders' proportionate ownership of New Sirius. Liberty also proposed that New Sirius would indemnify Liberty for liabilities that would arise from litigating the Transactions. Between October 25 and November 7, 2023, the parties exchanged drafts of the merger agreement.

On November 7, 2023, the Special Committee met with its advisors to discuss the reference price in an all-stock transaction to compensate minority stockholders. A higher reference price would increase the number of New Sirius shares held by Liberty and decrease the number of New Sirius shares held by Old Sirius' minority stockholders. LSXM would also receive a premium based on LSXM's market price

given the NAV Discount. The Special Committee did not push for supplemental diligence with respect to all of Liberty's debt and expected tax obligations and risks.

Between November 13 and November 29, 2023, the Special Committee and Liberty continued to exchange drafts of the merger agreement. On November 30, the Special Committee proposed an all-stock transaction using a reference price of $4.01 per share, which was Old Sirius's closing price on September 25, 2023. New Sirius would assume potential litigation liabilities if minority stockholders were adequately compensated, and New Sirius would assume contingent tax liabilities. Liberty countered with a $4.80 per share reference price which was the volume-weighted average price of SiriusXM's stock.

On December 11, 2023, the Special Committee met with its advisors to discuss the deal. The Special Committee's advisors warned of: the optics of a premium to Liberty's market value; an increase in pro forma leverage; subsequent impact on capital structure, credit ratings, cash interest, and financial flexibility; and a limitation on certain future activities given tax covenants.

Later that day, the Board voted to approve the Transactions and recommend them to Old Sirius stockholders. On December 12, 2023, Liberty announced that the parties had reached an agreement.

**I.      The Parties Agree To A Post-Closing Board Structure.**

In March and April 2024, the Board's Nominating Environmental, Social and Governance Committee considered New Sirius' board of directors. The new board would be placed into three classes of three directors. Class I included Hartenstein, Witz, and Salen. Class II included Procope, Meyer, and Evan Malone. Class III

13

included Maffei, Zaslav, and Rapino. Maffei would be Chairman. According to the Complaint, the staggered nature of the new board ensured that Liberty maintained control because Old Sirius designees comprised the first two classes and their terms expire by the end of the first or second annual meeting.

**J.      The Parties Agree To An Amended Exchange Ratio.**

Later, the parties amended the exchange ratio to reduce the total number of New Sirius shares post-closing by 90% (the "Amended Exchange Ratio"). The exchange ratio did not affect the proportionate ownership of New Sirius but reduced the number of outstanding New Sirius shares post-closing on a 10:1 basis. The Amended Exchange Ratio did not allow stockholders to hold fractional shares. They were instead given cash in lieu of any fractional shares they would have owned had that been allowed. On March 8, 2024, the Special Committee found that the Amended Exchange Ratio did not present conflicts for Liberty and Old Sirius' minority stockholders. The Special Committee recommended the new exchange ratio to the Board. The Board agreed with the Special Committee and approved the Amended Exchange Ratio on June 14.

In the Transactions, Old Sirius minority stockholders received one-tenth of a New Sirius share for every Old Sirius share they owned. Meanwhile, LSXM stockholders received 0.8375 of a New Sirius share for every LSXM share. The new exchange ratio resulted in Old Sirius stockholders owning 19% of New Sirius and LSXM stockholders owning 81%. New Sirius would also assume all LSXM Group's net liabilities, which were valued at $1.8 billion.

14

The Amended Exchange Ratio also includes a "Net Liabilities Share Adjustment," which partially compensates the minority stockholders for assuming LSXM Group's liabilities. The adjustment was meant to represent the amount of net liabilities Old Sirius' minority stockholders would indirectly assume.

The Amended Exchange Ratio did not account for the unique benefit that LSXM stockholders received from the collapsing NAV Discount.

**K. This Litigation**

On October 15, 2024, three Old Sirius minority stockholders ("Plaintiffs") filed this class action suit.[15] The Complaint contains three Counts:

- In Count I, Plaintiffs assert a direct claim against Liberty and Malone for breach of fiduciary duties as Old Sirius' controlling stockholders.

- In Count II, Plaintiffs assert a direct claim against the Committee Defendants for breach of fiduciary duties.

- In Count III, Plaintiffs assert a direct claim against the Non-Committee Defendants, Evan Malone, Blau, and Hickenlooper for breach of fiduciary duties.

On December 19, 2024, the Committee Defendants and Non-Committee Defendants moved to dismiss the Complaint.[16] The parties completed briefing the dismissal motion on March 19, 2025,[17] and the court heard oral argument on June 27, 2025.[18]

---

[15] *See* Dkt 1.

[16] Dkts. 18, 19, 22.

[17] Dkt. 39.

[18] Dkt. 70.

## II. LEGAL ANALYSIS

The movants seek dismissal under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[19] When considering a motion under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true, . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[20] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[21]

The movants argue that Plaintiffs fail to state a claim against them because they have not adequately alleged a non-exculpated claim against any of them under *Cornerstone*.[22] The Non-Committee Defendants also argue that aspects of Plaintiffs' claims are derivative and that Plaintiffs lack standing to pursue them under *Lewis*.[23] The Liberty Defendants joined the Non-Committee Defendants' arguments under *Lewis*, but they did not file a separate motion to dismiss.[24]

---

[19] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[20] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[21] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[22] 115 A.3d 1173.

[23] 477 A.2d 1040.

[24] Dkts. 18, 37.

### A. *Cornerstone*

The Company's charter contains an exculpatory provision. Under *Cornerstone,* when an exculpatory provision protects directors, a plaintiff must state a non-exculpated claim to survive a motion to dismiss. *Cornerstone* requires that a plaintiff allege facts sufficient to state a non-exculpated claim against each director; group pleading will not work.[25]

As to the Non-Committee Defendants, Plaintiffs argue that each lacked independence from Liberty and acted to advance Liberty's interest by approving the Transactions. As to the Committee Defendants, Plaintiffs argue that each labored under a controlled mindset on which the court can base an inference of bad faith.

#### 1. The Non-Committee Defendants

Plaintiffs allege that each of the Non-Committee Defendants (i) lacked independence from Liberty, Malone, or Maffei, and (ii) voted to approve the

---

[25] *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018) (a "well-[pled] . . . loyalty breach" must be pled "against each individual director; so-called 'group pleading' will not suffice").

Transactions.[26]  The Non-Committee Defendants dispute neither point.[27]  They argue, however, that these allegations are not enough to state a claim.  As to directors who lack independence from an interested person, *Cornerstone* requires that a plaintiff also plead that the director "acted to advance the self-interest of an interested party."[28]  According to the Non-Committee Defendants, pleading that a director "acting to advance"—which this decision refers to as the "action element" of *Cornerstone*—requires more than alleging that the director voted for a challenged transaction.[29]

Voting in favor of a transaction unquestionably advances the transaction.  In many instances, it is the ultimate action needed to complete the transaction.  This

---

[26] *See Malork v. Anderson*, C.A. No. 2022-0260-PAF, at 42 (Del. Ch. July 17, 2023) (TRANSCRIPT) ("The complaint alleges sufficient entanglement between the directors and [controller] such that, like *Gig3*, the directors would likely expect to be considered for directorships at [controller] entities[.]"); *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 720 (Del. Ch. 2023) ("It is reasonably inferable that these directors would 'expect to be considered for directorships' in companies—such as other SPACs—that [the controller] launches in the future. It is also rational to presume that the directors received compensation for these various roles, which would be accretive to their compensation in connection with [the company]."); *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *7 (Del. Ch. Sep. 28, 2015) (considering allegation that interested party had nominated directors to current board and other boards and inferring that directors could "expect to be considered for directorships in companies the [interested party] acquire[s] in the future"); *In re New Valley Corp.*, 2001 WL 50212, at *8 n.24 (Del. Ch. Jan. 11, 2001) ("Although some of the allegations of interestedness appear innocuous on the surface, the plaintiffs assert that some of the directors . . . are beholden to [the controller] for their allegedly lucrative employment positions outside of [the company] and, thus, are not disinterested.").

[27] Non-Comm. Defs.' Opening Br. at 1, 14, 16 & 17 n.5.

[28] *In re Oracle Corp. Deriv. Litig.*, 2022 WL 3136601, at *8 (Del. Ch. May 20, 2022).

[29] Non-Comm. Defs.' Opening Br. at 15–16.

court acknowledged as much in the context of a *Cornerstone* analysis in *Firefighters'*

*Pension System of City of Kansas City v. Foundation Building Materials, Inc.*[30]

In *Foundation Building Materials,* the plaintiffs challenged a third-party sale

in which a controller received a side benefit. A director-CEO who had approved the

transaction, but who allegedly lacked independence from the controller, moved to

dismiss the complaint under *Cornerstone*. The CEO argued that, by itself, approving

a conflicted transaction is not enough to show the action element of *Cornerstone* at

the pleading stage. The court rejected that argument, stating:

> *All that a claim for breach of fiduciary duty requires is a showing that the conflicted fiduciaries voted in favor of the interested transaction.* At that point, if the complaint states a reasonably conceivable theory as to why the director was not disinterested or independent, then the complaint has stated a reasonably conceivable claim for a breach of the duty of loyalty, and exculpation is unavailable.[31]

Put differently, the court held that a vote for a conflicted-controller transaction

suffices to "advance the controller's interest" and supports the action element of

*Cornerstone*.

The Non-Committee Defendants offer no reason for excluding a yes vote from

the category of actions sufficient to support a *Cornerstone* claim. Nor did they discuss

---

[30] 318 A.3d 1105 (Del. Ch. 2024).

[31] *Found. Bldg. Materials*, 318 A.3d at 1163 (emphasis added). In their reply brief, the Non-Committee Defendants portray *Foundation Building Materials* as a case where the CEO also "took steps during the sale process to facilitate the deal *and* voted in favor of the transaction." *Id.* at 1163; *see also* Dkt. 38 ("Non-Comm. Defs.' Reply Br.") at 2. But the Non-Committee Defendants ignore the plain import of the language italicized above as well as the discussion's context, which rejected the same interpretation of *Klein* that the Non-Committee Defendants advance here.

*Foundation Building Materials* in their opening dismissal brief. They instead cited to a series of cases that either do not support or do not directly address the issue—*In re BGC Partners, Inc. Derivative Litigation* ("*BCG II*"),[32] *Atallah v. Malone*,[33] and *Klein v. H.I.G. Capital, L.L.C.*[34]

In *BGC*, this court issued decisions addressing *Cornerstone* at the pleading stage (*BGC I*), on summary judgment (*BGC II*), and post-trial (*BGC III*).[35]

In *BGC I*, the court denied three of the four special committee directors' motions to dismiss under *Cornerstone*. This was so although the only allegation in support of the action element was the directors' approval of the conflicted-controller transaction.[36] *BGC I* thus stands for the proposition that a favorable vote alone satisfies the action element of *Cornerstone* at the pleading stage.

In *BGC II*, which Defendants cite, the court entered summary judgment for two of the three special committee defendants.[37] The ruling as to one defendant hinged on the action element. Weighing a full discovery record, the court observed

[32] 2021 WL 4271788 (Del. Ch. Sep. 20, 2021).

[33] 2023 WL 4628774 (Del. Ch. July 19, 2023).

[34] 2018 WL 6719717 (Del. Ch. Dec. 19, 2018).

[35] *In re BGC P'rs, Inc. Deriv. Litig.*, 2019 WL 4745121, at *14–15 (Del. Ch. Sep. 30, 2019) (*BGC I*); *BGC II*, 2021 WL 4271788, at *11–13; *In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641, at *43 (Del. Ch. Aug. 19, 2022) (*BGC III*).

[36] *BGC I*, 2019 WL 4745121, at *14 ("Plaintiffs have plead facts supporting a rational inference that, by voting to approve the Transaction, [the director defendants] acted to advance the self-interest of an interested party who stood on both sides of the Transaction . . . from whom they could not be presumed to act independently. Accordingly, the motion to dismiss under Rule 12(b)(6) is denied as to [the director defendants].").

[37] *BGC II*, 2021 WL 4271788, at *11–13

20

that the plaintiff failed to demonstrate the action element where the defendant did not chair the special committee, did not engage in separate discussions with the controller, and did not take an active role in the process.

In *BGC III*, the court entered judgment for the remaining special committee defendant,[38] finding that there was no evidence that he "jeopardized the substance" of the special committee's process.[39]

*BGC* does not support the Non-Committee Defendants' interpretation of *Cornerstone*'s pleading requirement. Quite the opposite—*BGC* shows that voting alone is enough at the pleading stage. And because neither *BGC II* nor *BGC III* directly addressed the effect of the directors' voting record, it is difficult to discern the application of *BGC II* and *BGC III* to the present issue.

Nor do *Klein* and *Atallah* shed light on the issue. Both dismissed claims against a conflicted director under *Cornerstone*. And in each case, the director inferably voted in favor, or at least approved, the challenged transaction or aspects of it.[40] But neither decision grappled directly with the effect of the director's vote on the *Cornerstone* analysis.

---

[38] *BGC III*, 2022 WL 3581641, at *43.

[39] *Id*. at *22.

[40] *Klein*, 2018 WL 6719717, at *18 (dismissing claims against a conflicted director under *Cornerstone* where, to support the action element, the plaintiff alleged that the CEO voted for the challenged transaction); *Attallah*, 2023 WL 4628774, at *13–14 (dismissing claims against a conflicted director under *Cornerstone* where, to support the action element, the plaintiff alleged that the director deemed Maffei's offer bona fide without investigating it and adopted management's proposed revisions to Maffei's employment contract).

Summing up the parties' cited sources, *Foundation Building Materials* addresses the issue directly and supports Plaintiffs' position. The *BGC* decisions read together support Plaintiffs' position. *Atallah* and *Klein* supply soft support for the Non-Committee Defendants' interpretation but do not grapple with the key issue.

The holdings of *Foundation Building Materials* and *BGC I* make sense given that a vote in favor is an "action to advance" and given the procedural posture at which defendants raise a *Cornerstone* defense. At the pleading stage, a stockholder often lacks insight into the full scope of each directors' actions. The board materials, to which stockholder pre-suit inspection is frequently limited, do not always reflect director conduct beyond the vote. Interpreting *Cornerstone* to require a stockholder to plead more than an affirmative vote would run the risk of discouraging a host of potentially meritorious suits against fiduciaries who approved transactions benefiting controllers from whom they lacked independence.

This decision thus follows *Foundation Building Materials* and *BGC I*. Voting alone is enough to support the action element of *Cornerstone* at the pleading stage. Plaintiffs have alleged the Non-Committee Defendants lack independence from Liberty and that each voted for the Transactions.[41] That is enough to state a non-exculpated claim as to each of the Non-Committee Defendants.

Because Plaintiffs have adequately alleged non-exculpated claims against the Non-Committee Defendants, their motion to dismiss Count III is denied.[42]

---

[41] *See, e.g.*, Compl. ¶¶ 21–22, 26–31, 199.

[42] This decision does not address Plaintiffs' alternative argument under *Cornerstone* that the Non-Committee Defendants were interested in the Transactions.

### 2. The Committee Defendants

To state a non-exculpated claim against the Committee Defendants, Plaintiffs argue that the Committee Defendants "fell victim to a controlled mindset."[43] They point to Liberty's influence on the Special Committee's composition. They also point to the Special Committee's conduct: its failure to bargain for consideration in exchange for collapsing the NAV Discount; its failure to negotiate for a majority of the minority voting condition; its failure to push back on Liberty Media's preferred deal structure; and its history of failing to effectively negotiate against Liberty Media.[44] They argue that the Special Committee's failure to obtain anything for the minority stockholders through negotiations is enough to support an inference of bad faith.

The Committee Defendants respond in two ways. They first argue that a "controlled mindset" is not a viable theory of disloyalty under Delaware law, but they overstate the point.[45] They next argue successfully that Plaintiffs have not alleged facts from which to infer a controlled mindset.

In *Trade Desk,*[46] Vice Chancellor Fioravanti discussed controlled-mindset theories generally when rejecting an argument similar to that advanced by Plaintiffs.

---

[43] Dkt. 33 ("Pls.' Answering Br.") at 25–41.

[44] *Id.* at 25–28.

[45] Dkt. 39 ("Comm. Defs.' Reply") at 7 (arguing that "no Delaware court has ever found that a so-called 'controlled mindset,' standing alone, gives rise to" a non-exculpated claim under *Cornerstone*).

[46] *In re Trade Desk, Inc. Deriv. Litig.*, 2025 WL 503015 (Del. Ch. Feb. 14, 2025) (*Trade Desk II*).

As he explained, the phrase "controlled mindset" first appeared in the court's post-trial opinion in *In re Southern Peru Copper Corp. Shareholder Derivative Litigation*.[47]

In *Southern Peru*, with the benefit of a trial record, the court held that a special committee comprised of otherwise "competent, well-qualified individuals with business experience" breached their fiduciary duties by falling "victim to a controlled mindset."[48] The facts supporting this holding were extreme. The committee was "empowered only to evaluate what the controller put on the table," expressed confusion "about whether it was actually empowered to negotiate," and never considered alternatives to the controller's demands.[49] There was no evidence that the committee re-evaluated the merger in light of the company's rising stock price or obtained *any* concessions for minority stockholders.[50] And the court held that the committee and its financial advisor "went to strenuous lengths" to justify equalizing the values of Southern Peru and the target company to serve the controller's interests rather than "pushing back on [the controller's] analysis."[51]

As the Vice Chancellor observed in *Trade Desk*, "[s]ince *Southern Peru*, the phrase 'controlled mindset' has become a shibboleth for stockholder plaintiffs to characterize the conduct of a board or committee that negotiates against an alleged

---

[47] *Id.* at *22 (citing *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 797–98 (Del. Ch. 2011), *aff'd sub nom.*, *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012)).

[48] *S. Peru*, 52 A.3d at 797–98.

[49] *Id.* at 763, 797.

[50] *Id.* at 798, 800.

[51] *Id.* at 801.

controller."[52] The phrase is often shorthand for allegedly ineffective negotiations— conduct that is, "at its core, a process failure."[53] This court has dismissed claims for breach of the duty of loyalty based on process failures alone.[54] But "[l]ike other mere process failures, it can, if combined with other well-pleaded allegations, contribute to a broader constellation of facts that support a finding or reasonable inference of disloyal conduct."[55]

In a handful of pleading-stage decisions, this court has deemed extreme process defects packaged as controlled-mindset theories sufficient to support a reasonable inference of disloyal conduct.

For example, in *In re Viacom Inc. Stockholders Litigation*,[56] the plaintiffs alleged that the Viacom special committee allowed the controller "to dominate their decision-making render[ing] them servile tools in [her] relentless pursuit of a Viacom/CBS combination to advance her interests."[57] The court found the plaintiff's theory reasonably conceivable where, among other things: the controller "hand-picked" each committee member for the board "after disloyal board members were

---

[52] *Id.* at *23.

[53] *Id*. at *24.

[54] *See, e.g., id.* at *29 (citing *McElrath ex rel. Uber Techs., Inc. v. Kalanick*, 2019 WL 1430210, at *16 (Del. Ch. Apr. 1, 2019) *aff'd sub nom. McElrath v. Kalanick*, 224 A.3d 982 (Del. 2020)); *Glean Tech Fund II LP v. McIntosh*, 2025 WL 2505049, at *17 (Del. Ch. Sep. 2, 2025) ("The Board's process may have had its flaws, but 'a failure to follow best practices is not necessarily a breach of fiduciary duty.'" (quoting *McElrath*, 2019 WL 1430210, at *16)).

[55] *Id*.

[56] 2020 WL 7711128 (Del. Ch. Dec. 29, 2020).

[57] *Id.* at *3.

removed"; the committee accepted the controller's direction that it would not consider a transaction other than the transaction favored by the controller; the committee did not request a majority-of-the-minority vote because the controller had resisted that term in the past; the committee failed to request other protections, like a collar on the deal price; the controller was "omnipresent" through the merger discussions; and that the "negotiations reflect[ed] a desire to placate the controller, not to land the best transaction possible for all Viacom stockholders."[58] The court also found, as part of its *Cornerstone* analysis, that plaintiffs had alleged that the controller's "tendency and history of ouster" and "willingness to take retributive action" impugned the independence of each committee member.[59]

The court likewise denied a motion to dismiss *Viacom*'s companion case, *In re CBS Corporation Stockholder Class Action and Derivative Litigation*.[60] The court based this determination on the same "extreme set of facts" at issue in *Viacom*, including that the CBS committee "welcomed the controller, with all her-self-interest, into the huddle."[61]

Similarly, in *Berteau v. Glazek*, the court denied the special committee defendants' *Cornerstone* motion where it was reasonably conceivable that the committee "never lifted its head from the sand."[62] As in *CBS*, the committee "was not

---

[58] *Id.* at *7, *23, *24.

[59] *Id.* at *22.

[60] 2021 WL 268779 (Del. Ch. Feb. 4, 2021).

[61] *Id.* at *43.

[62] 2021 WL 2711678, at *23 (Del. Ch. June 30, 2021).

prepared to exercise its ability to say 'no' to the controller" and "inexplicabl[y]" failed to secure minority protections like the majority-of-the-minority vote.[63] The committee failed to object to including conflicted directors in the meeting at which the exchange ratio was set, and otherwise allowed "persistent interference" by the controller.[64] The *Berteau* committee also allowed management to select the committee's legal advisor before the board formed the committee. That adviser had once represented management. And the adviser "reverted to its former role and advised the Company as its transactional counsel" in the deal.[65]

"Viewing the facts in their totality," the court in *Berteau* concluded that the "allegations support[ed] a reasonable inference that negotiations over deal terms were limited to the minimum necessary to confer a scintilla of legitimacy to the Special Committee process, and that the Special Committee abdicated their fiduciary duties . . . ."[66]

Ultimately, whether process failures support an inference of bad faith presents a classic judgment call as to whether the facts presented achieve the difficult task of impugning the good faith of otherwise independent and disinterested directors. This is "an issue of fact which must, at this stage, be determined from an examination of

---

[63] *Id.* at *22.

[64] *Id.* at *23.

[65] *Id.* at *22.

[66] *Id.* at *24.

well-pled facts in the Complaint."[67] And Plaintiffs have not adequately alleged the extreme facts from which to infer disloyalty here.

Plaintiffs argue that Liberty dictated the structure of the Transactions based solely on the fact that the committee agreed to the all-stock structure proposed by Liberty, ignoring the committee's negotiations over the reference price.

In the same vein, Plaintiffs paint the negotiations as ineffective because the Committee Defendants did not give the majority-of-the-minority vote term due consideration.[68] But that cannot be reasonably inferred from the Complaint. The October 5, 2023 committee meeting minutes, which are incorporated by reference in the Complaint,[69] demonstrate that the committee discussed the advantages and disadvantages of a majority-of-the-minority vote and expressed concern that it could jeopardize an otherwise beneficial deal "given the Company's relatively small public float."[70]

Plaintiffs argue that Liberty controlled the timing of the process based solely on the fact that the committee agreed to provide "preliminary feedback to Liberty" a week after receiving Liberty's September 22 proposal.[71] But it is not reasonable to

---

[67] *Viacom*, 2020 WL 771128, at *24 (quoting *Calesa Assoc., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016)).

[68] Pls.' Answering Br. at 31–34.

[69] *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016), *abrogated on other grounds by, Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

[70] Compl. ¶ 98.

[71] *Id*. ¶ 90.

infer bad faith on the part of the committee based on their willingness to provide preliminary feedback within a week.

Plaintiffs say that Liberty interfered with the process, but they allege no facts to that effect. They attempt to draw comparisons to *Berteau* by alleging that Liberty influenced the Special Committee's composition by including Solomon on a list of one of several advisors recommended to the committee. But that is a far cry from the facts of *Berteau*, where there was no sign that the committee ever formally retained the advisor, and the advisor served as the company's transaction counsel once the special committee process was complete.[72]

The only allegation that gives the court any pause is that Maffei communicated his preference that one of the independent directors, Amble, not serve on the committee because she was allegedly "difficult" to work with.[73] And Amble did not serve on the committee. One plaintiff-friendly inference from this allegation is that Maffei effectively vetoed Amble's involvement in the process. But even assuming this inference, it does not speak to what the Committee Defendants did over the course of the investigation. Nor does it support a claim that they acted disloyally.

In all, Plaintiffs did not plead enough to support a reasonable inference that independent directors acted disloyally in connection with the Transactions. The Committee Defendants' motion to dismiss Count II is granted.

---

[72] *See Berteau*, 2021 WL 2711678, at *22–24.

[73] Compl. ¶ 51.

**B.** *Lewis*

The Non-Committee Defendants argue that the Complaint asserts a derivative claim if it challenges the terms of the Transactions relating to the transfer of debt to New Sirius (the "Debt-Shifting Provisions").[74] The Non-Committee Defendants argue that Plaintiffs assert their claims as former stockholders of Old Sirius. Any standing they had was extinguished when the Transactions closed and Plaintiff ceased being Old Sirius stockholders. Those claims, they argue, should be dismissed.

Plaintiffs deny that they advance an independent claim for breach of fiduciary duty based on the Debt-Shifting Provisions.[75] They challenge the Transactions only, and that the Debt-Shifting Provisions rendered the Transactions unfair under the entire fairness standard. Based on Plaintiffs' representation, the Non-Committee Defendants' motion to dismiss aspects of Count III under *Lewis* is denied without prejudice to their ability to raise these arguments at a later point if they matter.

## III. CONCLUSION

The Committee Defendants motion to dismiss Count II is granted. The Non-Committee Defendants motion to dismiss Count III is denied.

---

[74] Dkt. 20 at 19–22.

[75] Pls.' Answering Br. at 53–55.